# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 12-2893

———————————————

United States of America

*Plaintiff - Appellee*

v.

Alvin Clay

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

——————————

Submitted: June 10, 2013
Filed: August 2, 2013

——————————

Before COLLOTON, GRUENDER, and BENTON, Circuit Judges.

——————————

GRUENDER, Circuit Judge.

Alvin Clay appeals the district court's[1] denial of his 28 U.S.C. § 2255 motion for post-conviction relief. On appeal, Clay contends that the district court used an incorrect standard to evaluate the effect of the Government's alleged use of perjured

———————————————

[1]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas.

testimony during his underlying trial for wire fraud and money laundering. For the reasons discussed below, we affirm the denial of Clay's motion for post-conviction relief.

## I. Background

Clay was licensed as an attorney in Arkansas and also held a real estate agent's license, a real estate broker's license, and a contractor's license, in connection with which he owned Clay Construction Company. He was convicted of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371 and four counts of money laundering in violation of 18 U.S.C. § 1957 for his role in a conspiracy to defraud the purchasers of five residential properties in Little Rock, Arkansas. The other charged conspirators were Raymond Nealy, who owned and operated Ideal Mortgage, Inc. and shared a suite of offices with Clay, and Donny McCuien, a manager for Burger King, whom Nealy employed as a loan originator.

In each of the five property transactions, which occurred between August 2002 and March 2003, Nealy arranged for an inflated appraisal of a residential property for sale. The conspirators would secure a naive purchaser for the property with the promise of a cash payment at closing and an assurance that the property soon would be resold or rented profitably, with no risk to the purchaser. Nealy then used falsified documents to arrange a loan for the purchase at the inflated appraisal amount, rather than the seller's actual asking price. The conspirators purloined the amount of the loan in excess of the seller's asking price by sending the closing agent an invoice for that amount from Clay Construction Company, ostensibly for renovation work requested by the seller. No renovation work was requested or performed for any of the five properties, but because each seller received his or her full asking price, no seller questioned the appearance of this additional line item on the seller's side of the closing statement. Likewise, because the Clay Construction line item was paid from funds nominally disbursed to the seller, no lender or purchaser raised any questions.

In total, closing agents paid Clay Construction more than $130,000 from these five property sales.

It is undisputed that, for each of the five property transactions, Clay received a check from the closing agent and deposited it into a Clay Construction bank account. From the first such check, Clay kept $10,000 and paid the remainder of nearly $24,000 to Nealy's mother. Notably, rather than paying the $24,000 in one lump sum, Clay used three cashier's checks each in an amount less than $10,000. For the remaining four checks, Clay kept a portion and distributed the remainder, totaling more than $80,000, to a corporation organized by McCuien named "McCuien Property Management and Construction, Inc." McCuien testified that he further divided that more than $80,000 among Nealy, Clay, and himself, although Clay denied receiving a further share of those funds from McCuien.

The scheme was uncovered when a tax preparer hired by Clay to prepare an IRS Form 1099 for the disbursements to McCuien notified the FBI of concerns about the legitimacy of the transactions. McCuien reached a plea deal, and the district court decided to sever the trials of Clay and Nealy. At Clay's trial in late May and early June 2008, Clay's theory of defense was that he innocently rented his contractor's license to Nealy and McCuien, believing in good faith that McCuien actually was renovating each property, and that Clay's retained portion of each payment from a closing agent merely constituted the fee for renting his license. Clay testified that Nealy had represented to him, and Clay had believed, that McCuien had experience in construction and contracting work. On both direct and cross-examination, however, McCuien repeatedly testified that, even after having formed a corporation named McCuien Property Management and Construction in 2002, he never held himself out to the public as a contractor, that he never engaged in either construction work or real estate transactions, and that Clay was aware no actual renovation work would ever take place. The jury returned a guilty verdict.

-3-

Clay moved for a new trial or, in the alternative, judgment of acquittal on the basis that his counsel was ineffective for, *inter alia*, failing to develop impeachment evidence that would have shown that, at the time McCuien testified, he in fact had extensive experience as a contractor and had participated in previous real estate transactions. At a two-day hearing on the motion, concluding in January 2009, Clay introduced evidence that McCuien had obtained his own contractor's license in 2006. In addition, one of McCuien's former girlfriends, who had not testified at trial, stated that McCuien openly claimed in late 2002 to buy, renovate, and sell homes as a side business. Another former girlfriend, April Flowers, stated that McCuien had convinced her to be a purchaser, and defrauded her, in four real estate transactions in 2003. Flowers also stated that the FBI had interviewed her in 2007 and that she had been subpoenaed to appear, but never called to testify, at Clay's trial. Ronald Smith stated that he worked on a six-person construction crew for McCuien that renovated nine houses beginning in the spring of 2006. Clay also introduced additional testimonial and documentary evidence of McCuien's participation in various other real estate sales in 2006 and 2007. The district court denied the motion for new trial or judgment of acquittal in June 2009, holding that the new evidence presented at the hearing was cumulative to evidence of McCuien's dishonesty that was presented at trial. We affirmed the denial of the motion on direct review. *See United States v. Clay*, 618 F.3d 946, 952 (8th Cir. 2010) (per curiam).

Meanwhile, shortly after the district court hearing on Clay's motion for new trial, the Government reached an agreement with Nealy that resulted in his guilty plea to a reduced charge of misprision of a felony. At Nealy's change-of-plea hearing, the district court questioned the reduced charge:

> THE COURT: . . . You put on a case in the Clay trial, and without hearing Mr. Nealy's defense, I mean, . . . the jury convicted Mr. Clay of conspiring with Mr. Nealy. And really and truly, the evidence was stronger against Mr. Nealy than against Mr. Clay. . . . So now that we have Mr. Clay convicted, we're in here pleading Mr. Nealy to a

-4-

substantially lesser offense. And it's not that I'm going to reject it . . . . But I am bothered some by it. Part of it is the fairness of the whole thing, because we have different parties being treated substantially different, at least on what's been presented to me, not based on anything related to culpability. So if there's anything else you can tell me, tell me, and if not, then --

MR. SNYDER: Well, I would say some things have come to our attention since the Clay trial that possibly could be detrimental to our case.

THE COURT: Do they have to do with a key witness?

MR. SNYDER: Yes, sir.

THE COURT: Okay.

*United States v. Nealy*, No. 4:04-cr-00274 (E.D. Ark.), Change of Plea Proceedings Tr. 4-5 Mar. 6, 2009, ECF No. 364.

Clay timely filed this § 2255 motion in February 2012, alleging, among other claims for relief, that his conviction was obtained through the use of perjured testimony from McCuien and that the Government knew, or should have known, that McCuien perjured himself.[2] Soon after Clay filed his motion, the district court sent a letter to Clay's counsel, with a copy to the Government and the "Court File," disclosing an out-of-court conversation between the district court and the

---

[2]Clay's opportunity to develop evidence about McCuien's false testimony at the hearing on his motion for a new trial, premised on a claim of ineffective assistance of counsel for failure to develop impeachment evidence, arguably procedurally defaulted this habeas claim that his conviction was based on the use of perjured testimony in violation of his right to due process. Because the Government chose not to argue that this claim was procedurally defaulted, however, we address the merits of the claim. *See Jones v. Norman*, 633 F.3d 661, 666 (8th Cir. 2011).

-5-

Government after direct appeals were exhausted in all cases related to the conspiracy. In that conversation, the Government confirmed that it had changed its evaluation of Nealy's case because "the prosecutors had learned that Donny McCuien had lied to them."[3]

The district court nevertheless denied relief on all Clay's § 2255 claims. With respect to the false testimony claim, the court found no need to decide whether the Government had used perjured testimony and knew or should have known it was perjured, holding that in any case Clay could not show prejudice because there was "no reasonable likelihood that the perjured testimony would have affected the jury's verdict." The district court granted a certificate of appealability solely with respect to the false testimony claim.

## II.     Discussion

"On appeal from a denial of a 28 U.S.C. § 2255 motion, we review the district court's legal conclusions de novo and its factual findings for clear error." *Morelos v. United States*, 709 F.3d 1246, 1249 (8th Cir. 2013).

For purposes of this analysis, we assume without deciding that the Government used perjured testimony and knew or should have known it was perjured. Clay argues that the district court misapplied the standard for assessing prejudice to the defendant from the use of false testimony. The Supreme Court has established that, for cases under direct review, "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood

---

[3]The Government moves to strike the letter and all references to it from Clay's addendum and briefs, arguing that the letter is not part of the record on appeal. We deny the motion. The record on appeal includes "the original papers and exhibits filed in the district court," Fed. R. App. P. 10(a)(1), and, although the letter from the district court was not docketed, it is clearly marked as copied to the court's file.

that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted). According to Clay, the district court incorrectly assessed "reasonable likelihood" in this case by examining the sufficiency of the evidence in light of the corrected testimony. *Cf. Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (holding that prejudice for a general *Brady* withholding violation can be demonstrated "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," even if the evidence taken as a whole might still have been sufficient to support a conviction). We agree with Clay that the *Agurs* standard for evaluating the materiality of the Government's knowing use of perjured testimony is less onerous to the defendant than a sufficiency of the evidence test, and less onerous even than the standard of materiality for a general *Brady* violation. *See Rosencrantz v. Lafler*, 568 F.3d 577, 587 (6th Cir. 2009) (observing that the materiality standard for false testimony is "lower," "more favorable to the defendant," and "hostile to the prosecution" as compared to the standard for a general *Brady* withholding violation (quoting *Gilday v. Callahan*, 59 F.3d 257, 267-68 (1st Cir. 1995))).

The proper materiality standard, however, is only part of the equation. We also must consider whether harmless-error review is appropriate. On habeas review, as here, constitutional violations that are categorized as "trial error" generally are "amenable to harmless-error analysis." *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993). "Trial error 'occur[s] during the presentation of the case to the jury,' and . . . it 'may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'" *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991)). In contrast to trial error, "'structural defects in the constitution of the trial mechanism' . . . —deprivation of the right to counsel, for example—require[] automatic reversal of the conviction because they infect the entire trial process." *Id.* at 629-30 (quoting *Fulminante*, 499 U.S. at 309) (footnote omitted).

We hold that a false testimony claim falls within the category of trial error, rather than structural error. "[D]espite the fundamental nature of the injury to the justice system caused by the knowing use of perjured testimony by the state, the Supreme Court has not deemed [such] errors to be structural in the sense that they affect[ ] the framework within which the trial proceeds." *Rosencrantz*, 568 F.3d at 589 (third alteration in original) (internal quotation marks omitted) (quoting *Shih Wei Su v. Filion*, 335 F.3d 119, 126 (2d Cir. 2003)). Indeed, in this case, McCuien was one of approximately forty witnesses to appear during a seven-day trial. Thus, any error arising from McCuien's testimony "may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." *Brecht*, 507 U.S. at 629 (quoting *Fulminante*, 499 U.S. at 308-09).[4]

---

[4]We note, as did the Sixth Circuit in *Rosencrantz*, that *Brecht* harmless-error analysis is unnecessary for a general *Brady* withholding claim because "practically speaking, the two analyses are the same." *Rosencrantz*, 568 F.3d at 584 n.1. More specifically, "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different' necessarily entails the conclusion that the suppression must have had 'a substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *Kyles*, 514 U.S. at 435 (citations omitted in original)). Because the materiality standard for a claim for the knowing use of perjured testimony is less onerous for the defendant, however, a knowing use of perjured testimony may be material under *Agurs* and yet still be harmless error under *Brecht*. *See Rosencrantz*, 568 F.3d at 589 (citing *Gilday*, 59 F.3d at 267-68). *But see Hayes v. Brown*, 399 F.3d 972, 984-85 (9th Cir. 2005) (en banc) (holding without further explanation that, because application of the materiality standard for general *Brady* withholding claims renders a *Brecht* harmless error analysis unnecessary, "[a]pplication of the *Agurs* 'any reasonable likelihood' standard necessarily forecloses a *Brecht* harmless error analysis" as well).

We also note that "harmless-error review under *Brecht* did not 'foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict.'" *Rosencrantz*, 568 F.3d at 589 (quoting *Brecht*, 507 U.S. at 638 n. 9). However, "we do not view this case as the

-8-

Accordingly, Clay can obtain habeas relief only if the asserted trial error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  This standard requires a showing of "actual prejudice" for habeas relief.  *Id.* (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).  The Supreme Court has avoided assigning a formal burden of proof for this analysis, but it has stated that "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless.  And, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).[5]

Clay argues that McCuien's false testimony about his lack of experience in real estate and contracting work was prejudicial because it tended to make the jury doubt Clay's asserted good-faith belief that McCuien actually had performed the invoiced renovation work.  Based on the record as a whole, however, McCuien's false testimony could not actually prejudice the jury's verdict.

First, the evidence apart from McCuien's testimony strongly weighed in favor of conviction.  *See Chang v. Minnesota*, 521 F.3d 828, 833 (8th Cir. 2008) (considering "the overall strength of the prosecution's case" in an analysis of *Brecht* harmless error).  Clay argues that McCuien provided the only direct evidence of Clay's knowing participation in the conspiracy, but "a 'tacit understanding' among co-conspirators may be, and often will be, inferred from circumstantial evidence."

unusual, especially egregious instance of prosecutorial misconduct, or one that reveals any 'pattern of prosecutorial misconduct.'" *Id.*

[5]Although *Brecht* involved review of a state-court conviction under 28 U.S.C. § 2254, its harmless-error standard applies to collateral challenges to a federal-court conviction under § 2255 as well.  *See United States v. Dago*, 441 F.3d 1238, 1246 (10th Cir. 2006).

*United States v. Wintermute*, 443 F.3d 993, 1003 (8th Cir. 2006). Here, the undisputed circumstantial evidence creates an overwhelming impression that Clay was not an innocent pawn in the scheme. The entire proceeds of the conspiracy were deposited into a checking account controlled solely by Clay. Clay retained for himself nearly one-third of the gross payment for each of the first two purported contracting jobs, with no regard for the payment of the myriad expenses associated with actual construction work. (Because Clay Construction had supervised a legitimate project in the past, Clay would have to know that losing a third of the gross payment left Nealy and McCuien operating at a loss if the construction work actually had been performed and billed honestly.) Clay disbursed the remainder of the proceeds from the first job to Nealy's mother in three separate checks of less than $10,000 each, and he did not question this unusual payment plan. He did not ask to see any records of material and labor costs, agreements with subcontractors, or other evidence of legitimate construction work. He never visited the work sites, despite being personally listed as "supervisor" on some of the invoices.

These circumstances are all explained easily if Clay was a knowing participant in the scheme. On the other hand, for the jury to accept Clay's theory that he was being duped by McCuien and Nealy, the jury would have to believe that McCuien and Nealy were willing to pursue this complicated criminal scheme under a constant risk of exposure if Clay decided at any time to drive by a work site or ask a simple question about expenses or billing. On this record, the jury was not moved from believing the latter explanation to believing the former merely by McCuien's false testimony about a lack of real estate and contracting experience.

Second, we agree with the district court that McCuien's false testimony had little impact on the verdict for the additional reason that McCuien was impeached so thoroughly at trial. *See Chang*, 521 F.3d at 833 (considering "the extent of cross-examination otherwise permitted"). Two of the defrauded home purchasers testified about McCuien presenting lucrative real estate opportunities, only to

discover that McCuien had lied to them and left them in debt. Another purchaser recruited by McCuien for a similar transaction testified that she stopped doing business with him after the seller of one of the homes warned her that McCuien and Nealy had made misrepresentations in the sale documents and had not followed through on their promises to him. This purchaser also testified that the local police had warned her son's girlfriend, who worked at the Burger King managed by McCuien, to "stay away from" McCuien. In response to the Government's hearsay objection, the district court stated, "[I]nsofar as there's been an insinuation that Donny McCuien was not entirely honest, that's all the way through this trial, so I think that's harmless and I won't strike that testimony . . . . All these people who dealt with him have now testified he was dishonest with them . . . ." Indeed, during Clay's case-in-chief, McCuien's own father testified that McCuien had lied on the stand about being authorized to sell his father's tools: "He didn't sell no tools for me. Donny borrowed some of my tools and never returned them."

More specifically, McCuien's false testimony that he had no experience in either construction work or real estate transactions was directly contradicted by several trial witnesses. *See Chang*, 521 F.3d at 833 (considering "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points"). One witness stated she had purchased two properties from McCuien in 2005 and that McCuien had performed construction work on both properties. Another witness testified that he had done painting, flooring, and roofing work on three houses for McCuien in 2003 or 2004. A third testified that he had purchased from McCuien "a compressor, a generator, some nail guns, and a couple of other items" in 2007 that the witness agreed would be used only in a "serious type of construction work." Finally, McCuien's own testimony about his alleged lack of prior experience in real estate and contracting work was often given in an evasive and argumentative fashion. After hearing from a cavalcade of witnesses who each described McCuien's willingness to lie repeatedly, and three witnesses with personal knowledge that McCuien had been associated with real estate transactions and

-11-

contracting work between 2004 and 2007, the jury did not credit McCuien's contrary testimony on that point.

Accordingly, assuming McCuien's testimony that he had no experience in real estate transactions and contracting work was false and that the Government knew or should have known of its falsity, we have no grave doubt that the challenged testimony did not produce a "substantial and injurious effect or influence in determining the jury's verdict." *O'Neal*, 513 U.S. at 436. We therefore affirm the denial of Clay's § 2255 motion for post-conviction relief.

## III. Conclusion

For the foregoing reasons, we affirm the denial of Clay's § 2255 motion for post-conviction relief.

_____