**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-9003
_____

SAMUEL RANDOLPH

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF
CORRECTIONS; SUPERINTENDENT GREENE SCI; and
SUPERINTENDENT ROCKVIEW SCI,
                              Appellants.
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(District Court No. 1:06-cv-00901)
District Judge: Honorable Christopher C. Conner
_____

Argued April 26, 2021

Before: CHAGARES, KRAUSE, and RESTREPO,
*Circuit Judges*

(Filed: July 20, 2021)
_____

Ryan H. Lysaght [ARGUED]
Dauphin County Office of District Attorney
101 Market Street
Harrisburg, PA 17101

*Counsel for Appellants Secretary Pennsylvania Department of Corrections, Superintendent Greene SCI, and Superintendent Rockview SCI*

Jennifer Chiccarino
Aren Adjoian [ARGUED]
Federal Community Defender Office for the Eastern District
  of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

*Counsel for Appellee Samuel Randolph*

—————

OPINION OF THE COURT

—————

RESTREPO, *Circuit Judge*.

The week before his state capital trial, Samuel Randolph hired Samuel Stretton, his counsel of choice, to replace Allen Welch, his court-appointed lawyer. Once he was hired, Stretton, on the Thursday before Monday's jury selection, entered his appearance and asked the trial court if it could delay the start of trial until the following month. Citing previous delays and the proximity to trial, the trial court denied that request. Stretton next asked if the trial court could delay the start of trial by just a couple of days. But the court denied that request, too. Finally, Stretton asked if the trial court could push back Monday morning's jury selection by just three hours so that he could attend a previously scheduled, mandatory engagement in the morning and then pick Randolph's jury in the afternoon. As it had twice before, the trial court denied Stretton's request and set jury selection for Monday morning. Then, when Stretton did not appear for jury selection, the court denied Stretton's motion for a continuance and rejected his entry of appearance. Randolph therefore had no choice but to proceed to trial represented by his court-appointed lawyer.

2

The trial ended in convictions on all counts, including two counts of first-degree murder, and the trial court sentenced Randolph to death.

On direct appeal, the Pennsylvania Supreme Court upheld Randolph's convictions and sentence, and rejected Randolph's claim that the trial court violated his Sixth Amendment right to the counsel of his choice. Years later, on federal habeas review, the District Court determined that the Pennsylvania Supreme Court's decision unreasonably applied clearly established federal law, warranting *de novo* review of Randolph's Sixth Amendment claim. Conducting that review, the District Court concluded that Randolph suffered a Sixth Amendment violation, a structural error not subject to harmless error analysis. The Court therefore granted Randolph's petition for a writ of habeas corpus and gave the state ninety days to retry Randolph or release him, pending the resolution of any appeal. The Commonwealth now appeals and, for the reasons that follow, we will affirm.[1]

## I.  BACKGROUND

Although this case has a long procedural history, we recount here only the handful of events in the months leading up to Randolph's trial that are relevant to his Sixth Amendment choice-of-counsel claim. Those facts include the trial court's appointment of counsel; the degradation of the relationship between Randolph and his court-appointed counsel; Randolph's consideration of proceeding pro se; the attempt by Randolph's counsel of choice to continue the trial to allow him to represent Randolph; and the trial court's decision not to delay the start of jury selection, which had the effect of preventing Randolph from being represented by the counsel of his choice.

---

[1] Throughout the opinion we refer to the appellants—the Secretary of the Pennsylvania Department of Corrections, the Superintendent of SCI Greene, and the Superintendent of SCI Rockview—collectively as the Commonwealth.

## A. The state trial court appoints counsel for Randolph

In July 2002, in the Court of Common Pleas of Dauphin County, Pennsylvania, Randolph was arraigned on two counts of first-degree murder, one count each of attempted murder and conspiracy to commit murder, five counts of aggravated assault causing serious bodily injury, and several other lesser charges. In line with Pennsylvania law governing punishment for first-degree murder, the government informed Randolph that it would seek the death penalty.

Two attorneys, Anthony Thomas and Roger Laguna, were present at Randolph's July 2002 arraignment. But neither was willing or able to represent Randolph on the capital charges. Thomas attended at the request of Randolph's family but did not enter a formal appearance. He had been a member of the bar for just two years and had never tried a homicide case, let alone a capital one. Roger Laguna had been handling Randolph's less serious charges. But he too felt unprepared to try the capital case. So he asked the trial court to appoint substitute counsel. The trial court obliged. The following month, the trial court appointed Allen Welch to lead Randolph's defense, and set trial for February 2003.

## B. Randolph's trial is delayed and his relationship with appointed counsel deteriorates

Randolph's relationship with Welch began to deteriorate soon after Welch's appointment. At a January 3, 2003, pretrial conference, Randolph told the court that he and Welch were at odds about trial strategy. Welch wanted Randolph to submit to psychological evaluations—perhaps to pursue an insanity defense, *see* App. 614, or at least to gather evidence of circumstances mitigating capital punishment—but Randolph staunchly refused. Additionally, Randolph wanted to press certain arguments (relating, it seems, to prosecutorial misconduct and constitutional violations) that he claimed Welch was not even entertaining.

Randolph also expressed to the court his dissatisfaction with Welch's commitment to his case. Randolph told the

4

court that Welch had visited him just once in the five months since Welch's appointment, App. 614, and that Welch had told him he only took the appointment as a "favor" to the county's court administrators, App. 615. Welch assured the court that he was committed to Randolph's defense. He reminded the court that Randolph's criminal case was complex and claimed he had only recently received the bulk of Randolph's case file from Randolph's previous counsel and still had not received portions of Randolph's grand jury transcripts from the Commonwealth.

Despite Welch's assurances, Randolph was convinced Welch did not have his best interests at hand. Indeed, Randolph's relationship with Welch had deteriorated to such a degree that Randolph asked the court whether he could represent himself pro se. App. 618 ("Your Honor, you did say that I did have an option . . . to go pro se if I would want to, right?"). The court confirmed that "[t]hat's a right you have" but "would just strongly, strongly tell you not to do that." App. 618. Welch agreed, acknowledging that Randolph "has an absolute right to proceed pro se," but "plead[ed] with him with every fiber of my being not to do that." *Id.* Sensing that proceeding pro se would be unwise, Randolph then asked if Thomas could represent him, as well. After a brief sidebar, Thomas agreed to participate in Randolph's defense. App. 617-18.

By the end of the hearing, Randolph, Welch, and the court appear to have reached a tenuous compromise. With Thomas assisting Welch, Randolph begrudgingly accepted Welch as lead counsel, and Welch agreed to focus more of his energy on Randolph's case. *See* App. 613. But because Welch was nowhere near prepared to try the case, the court agreed to delay the start of trial until March 10, 2003.

## C. Another delay, further acrimony, and Randolph again requests to proceed pro se

Trial did not take place in March, however. Welch's mother became critically ill and was hospitalized. Welch

5

therefore moved for another continuance. The trial court granted that request and reset trial for May 5, 2003.

With the trial delayed, the trial court, later in March, held another conference to dispose of various pretrial motions filed by the parties. The hearing marked a further deterioration in Randolph's relationship with Welch. For example, near the end of the conference, Randolph asked the court what his speedy trial rights were and whether and how he could effectuate them. As part of its response, the trial court pointed out that Randolph already had filed his pretrial motions. Randolph claimed he had no idea what motions had been filed on his behalf or what those motions contained, and again complained that Welch refused to visit him. App. 763 ("I don't even know what motion was filed on my [behalf]—[Welch] won't come see me. He won't tell me or give me a copy of nothing. I don't even know what's going on, Your Honor."). Welch conceded that he did not share the motions with Randolph prior to their filing and that he had only visited Randolph in prison once. *See id.* Randolph again asked to represent himself pro se. *Id.* ("To settle all this, I would like to go pro se on the record right now."). The trial court refused to grant Randolph's request then-and-there, and instead told Randolph to contemplate his decision and, if he wished, to file a motion articulating the reasons supporting his request.

The following week, the trial court held another pretrial conference to consider Randolph's request to proceed pro se. At the conference, Randolph complained of "multiple deficiencies concerning Mr. Welch's performance," and "ma[d]e an oral motion to change [his] appointed counsel." App. 765. The trial court denied Randolph's motion, telling Randolph that "[t]he Court appoints counsel for you," and that it "[did not] see anything in [Welch's] performance that would even merit that request or for me to grant that request." *Id.*

Randolph and the trial court then discussed Randolph's request to proceed pro se. Randolph asked the court whether, if he were to proceed pro se, he could have daily access to the prison's law library. (The trial court said it would ask the

prison's warden to grant Randolph more time in the library, but that it could not guarantee any result.) Randolph then asked who would serve as standby counsel should he proceed pro se. The court told Randolph that it would invite Thomas to be standby counsel but, if Thomas declined, Welch would serve in the role. Randolph protested, but the court made clear that Randolph had only two options: "Do you want to proceed pro se with standby counsel as I've described or do you want Mr. Welch to continue to represent you?" App. 769. With those as his choices, Randolph decided against proceeding pro se and Welch continued as Randolph's counsel.

## D. Randolph hires Samuel Stretton, and Stretton enters his appearance and moves to continue the trial

Randolph's fortunes changed the week before trial. That week, through the sale or impending sale of a family asset, Randolph secured the funds necessary to replace Welch with his choice of counsel, Samuel Stretton. Randolph had first contacted Stretton in January 2003 but could not afford to hire him. With Stretton convinced that Randolph had secured the requisite funds, Stretton, on the Wednesday before Monday's start of trial, entered his appearance and moved to continue the trial until the following month.

The next day, the court convened a conference call with the parties to discuss Stretton's entry of appearance and continuance motion. On the call, Stretton explained the bases for his continuance request. First, he observed that he had just been hired and would need at least some time to become familiar with the case. Second, he explained that throughout the next week (the first week of the trial) he had numerous conflicts, including an inescapable one Monday morning, the morning of jury selection.

Stretton also outlined the services he could offer Randolph that Welch could not. Stretton emphasized that he "could[] hire the experts or the investigators that are needed in a capital case: . . . the mitigation expert, the psychiatrist, the school records and people, everything else you need when you try

7

these cases," App. 627, whereas Welch, facing significant financial limitations as a court-appointed attorney, likely could not, *see* App. 628 (Welch noting that "[t]here also could be no denying that the restrictions being economically placed on me by the court with the fight we had over just getting some investigative money, to say nothing about not being able to . . . [get] the money for the types of experts Mr. Stretton will be able to get involved in the thing.").

Welch supported Randolph's desire to switch lawyers. Welch said that he would "hate" to see the case proceed to trial "as unhappy as [Randolph] is with what I'm doing for him and with another attorney waiting to jump into the case." App. 626. Welch also "urge[d] [the court] to proceed carefully," since "the right to counsel of your choice is pretty darn well etched in stone." App. 626. Welch was concerned that, "if we hastily take this to trial, . . . [we] will go through it all again at some point down the road." *Id.*

The state opposed Stretton's continuance motion. It claimed that Randolph "tarried a great deal" in his attempt to hire Stretton. App. 627. The state's lawyer also claimed that witnesses he was planning on calling had been "bribed not to testify by Mr. Randolph or his representatives," *id.*, and he thought further delay would allow Randolph more time to carry out that scheme.

The trial court said its "inclination" was to deny Stretton's continuance and proceed with jury selection on the morning of Monday, May 5. App. 627. The court noted that the case "got continued once before" and that "[t]his is the second time we have brought in a special jury panel for this case." *Id.* And while the court appeared receptive to delaying the penalty portion of the trial so that Stretton could retain and deploy experts, it appeared unwilling to delay the start of jury selection. App. 627 (Court: "[M]y inclination is not to continue the case in terms of selecting the jury on Monday, Tuesday, Wednesday, however long that takes. The plan has always been to go into the trial stage at that point.").

8

Welch then jumped in. He suggested that the court's reason for not delaying the start of jury selection was easily fixed—the summoned jurors "could be called with a phone call and called off." App 628. Welch also thought the court's proposal to allow him to pick the jury and try the guilt phase and then let Stretton try the penalty phase was not a "viable and wise way to proceed." App. 628. And Welch again raised the constitutional issue. He asked the trial court what the state appellate courts would think about the trial court's reasons for denying Stretton's motion for a continuance or Randolph the counsel of his choice. *See id.*

The court was not moved. It resisted Welch's characterization that its tentative decision to deny the continuance "was based on economics and the jury panel." App. 628. It claimed it was "weighing very weighty matters on behalf of Mr. Randolph," including his right to counsel, against countervailing interests of the state, including the prompt resolution of the case. *Id.* The court noted that Randolph's case was "old" and had "been around," and that "we have dealt with all the pretrial matters, and we are ready to go to trial." App. 629.

Stretton tried one last time to convince the court to delay Monday's jury selection. He asked the court whether it had "any flexibility," even "like a day or two." *Id.* The trial court refused to budge. It said the "[jury] selection process is pretty much etched in stone." *Id.* But it said it "certainly would consider" including time between the end of jury selection and the beginning of trial so that Stretton had some time to prepare. *Id.* The conference ended soon thereafter with jury selection still scheduled for the morning of Monday, May 5.

### E. The trial begins, and begins without Stretton

The parties convened in court Monday morning before jury selection to clarify Randolph's representation. The on-the-record conversation began at 10:37 a.m. App. 636. The court recounted an off-the-record conversation it had with the parties the previous Friday. In that conversation, Stretton had modified his continuance request, asking for Monday's 9:00

9

a.m. jury selection to be postponed only until 12:00 p.m. That way, Stretton could pick Randolph's jury and still attend his previously scheduled engagement in the morning.

The court noted that it had instead agreed to move jury selection back one hour, from 9:00 a.m. to 10:00 a.m. App. 637. It also noted that it "fully expected to see" Stretton or someone on his behalf that morning "to begin the jury selection process." *Id.* When Stretton did not appear by 10:00 a.m., the trial court formally denied Stretton's continuance motion, App. 637, and his entry of appearance, App. 638, indicating only that it would entertain Stretton's participation if he re-filed his entry of appearance at a later date.

Welch tried once more to persuade the court to delay jury selection so that Stretton could pick the jury and try the case. He told the court the continuance request was "an appropriate request given the fact that I'm court-appointed, that I have at this point absolutely a complete breakdown of communication with my client, which is largely why Mr. Thomas is here, . . . he acts as a translator." App. 638.

The trial court held firm, denied Welch's last overture, and called for the jury panel. The prospective jurors entered the courtroom at 11:10 a.m., App. 640, fifty minutes before the time that Stretton would have been available.

\* \* \*

After two days of jury selection and a four-day trial, the jury convicted Randolph on all counts, including the capital murder charges. The court permitted Randolph to proceed pro se during the penalty phase. Randolph refused, however, to testify or present any mitigation evidence. The jury found two aggravating circumstances and no mitigating ones and returned a verdict of death on both capital counts.

Stretton represented Randolph at the formal sentencing proceeding. Stretton moved for a new trial and asked that Randolph's sentences be vacated based, respectively, on the trial court's failure to grant a continuance and its alleged error

10

in allowing Randolph to represent himself at the penalty phase and present no mitigating evidence. Stretton argued that the trial court's denial of the continuance he requested violated Randolph's Sixth Amendment right to choice of counsel and his Fourteenth Amendment right to due process, as well as similar protections under the Pennsylvania Constitution. The trial court denied Stretton's motions for relief and sentenced Randolph to death.

## F. The Pennsylvania Supreme Court rejects Randolph's Sixth Amendment claim on direct appeal

Because Randolph had been sentenced to death, his appeal went directly to the Pennsylvania Supreme Court. Among other claims, Randolph argued that the trial court's denial of Stretton's motion for a continuance had violated his Sixth Amendment rights. The Pennsylvania Supreme Court addressed and rejected that claim, as follows:

> [Randolph] argues the trial court erred in denying him the right to have private counsel represent him during trial and in denying a continuance to enable private counsel to represent him. He contends he sought private counsels [sic] representation because there was a major breakdown in communication between him and court-appointed counsel and because court-appointed counsel was unprepared, rather than for purposes of delay.
>
> . . .
>
> We have held, however, that the constitutional right to counsel of one's own choice is not absolute. Rather, "the right of the accused to choose his own counsel, as well as the lawyer's right to choose his clients, must be weighed against and may be reasonably restricted by the state's interest in the swift and efficient administration of criminal justice." Thus, this Court has explained that while defendants are entitled to choose their own counsel, they should not be permitted to unreasonably "clog the machinery of justice" or hamper

11

and delay the state's efforts to effectively administer justice.

. . .

[Randolph's] case had already been continued twice at the request of court-appointed counsel. [Randolph] waited until May 1, 2003, two business days before trial was scheduled to commence, to apprise the trial court of his desire to have private counsel represent him, even though he had first contacted private counsel about representation in January, 2003. The trial court denied [Randolph's] request for a continuance but gave private counsel the opportunity to participate and was willing to accommodate his schedule and allow him time to prepare following jury selection. However, private counsel never showed up at trial or during sentencing. In considering the motion for continuance, the trial court weighed [Randolph's] right to counsel of his choice against the state's interest in the efficient administration of justice. We find no abuse of discretion in the trial court's refusal to grant [Randolph's] request for a continuance.

*Commonwealth v. Randolph*, 873 A.2d 1277, 1282 (Pa. 2005) (all citations omitted).

The United States Supreme Court denied Randolph's petition for certiorari. *Randolph v. Pennsylvania*, 547 U.S. 1058 (2006). Through counsel, Randolph then initiated federal habeas proceedings in the District Court.[2] As amended, Randolph's habeas petition advanced fifteen claims, including the Sixth Amendment choice-of-counsel claim rejected by the Pennsylvania Supreme Court. The District Court held an evi-

---

[2] Randolph also initiated proceedings in state court under Pennsylvania's Post Conviction Relief Act. Those proceedings ended in withdrawal of all claims and are otherwise irrelevant to the issues on appeal here. So we do not discuss them further. And there is no dispute that Randolph exhausted this claim. *See* 28 U.S.C. § 2254(b).

dentiary hearing at which multiple witnesses testified, including Stretton and Thomas. Afterward, the parties briefed their positions.

The District Court's decision followed. In it, the District Court addressed only the choice-of-counsel claim, as the disposition of that claim obviated the need to address any others. The District Court determined that while the Pennsylvania Supreme Court did not misstate the governing law, its application of that law was objectively unreasonable given the facts of Randolph's case; that its decision, therefore, was not entitled to deference under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"); and that Randolph's Sixth Amendment claim must be reviewed *de novo*.

Reviewing the claim *de novo*, the District Court concluded that the state trial court violated Randolph's Sixth Amendment right to choice of counsel. And it held that such a violation constituted structural error, that is, error immune from harmless error analysis. Consequently, the District Court granted Randolph a writ of habeas corpus, vacated Randolph's convictions and sentence, directed the Commonwealth to retry or release Randolph within ninety days, and stayed the execution of the writ until thirty days after final disposition of any appeal. This timely appeal by the Commonwealth followed.

## II. COMMONWEALTH'S APPEAL

The Commonwealth appeals the District Court's grant of habeas corpus on Randolph's convictions and sentence based on his Sixth Amendment choice-of-counsel claim. For the reasons set forth below, we will affirm the District Court.

### A. Jurisdiction and Standard of Review

The District Court had jurisdiction over Randolph's petition for a writ of habeas corpus under 28 U.S.C. §§ 2241 and 2254, and we have jurisdiction under 28 U.S.C. §§ 1291 and 2253. Our review of the District Court's order granting Randolph habeas relief is two-fold: We review its legal conclu-

sions and any factual inferences it drew from the state court record *de novo* and, because it conducted an evidentiary hearing, its new factual findings for clear error. *Mathias v. Superintendent Frackville SCI*, 876 F.3d 462, 475 (3d Cir. 2017); *Albrecht v. Horn*, 485 F.3d 103, 114 (3d Cir. 2007); *Hakeem v. Beyer*, 990 F.2d 750, 758 (3d Cir. 1993). The Commonwealth was not required to obtain a certificate of appealability prior to seeking review of the District Court's decision to grant Randolph's habeas petition. *See* Fed. R. App. P. 22(b)(3); *Slutzker v. Johnson*, 393 F.3d 373, 375 n.1 (3d Cir. 2004).

Under AEDPA, Randolph, to prevail on his habeas petition, carried the burden of demonstrating that the Pennsylvania Supreme Court's decision was "'contrary to' federal law then clearly established in the holdings of [the Supreme] Court," "'involved an unreasonable application of' such law," or "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (quoting 28 U.S.C. § 2254(d)(1), (2)).

"A state court decision is 'contrary to' clearly established federal law if it 'applies a rule that contradicts the governing law set forth' in Supreme Court precedent, or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different' from that reached by the Supreme Court." *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)) (citation omitted) (alteration in original); *see also Travillion v. Superintendent Rockview SCI*, 982 F.3d 896, 901 (3d Cir. 2020).

By contrast, a state court decision reflects an "unreasonable application of such law" only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents," a standard the Supreme Court has advised is "difficult to meet" because it was "meant to be." *Richter*, 562 U.S. at 100, 102. As the Supreme Court has cautioned, an "*unreasonable* appli-

14

cation of federal law is different from an *incorrect* application of federal law," *id.* at 101 (quoting *Williams*, 529 U.S. at 410), and whether we "conclude[] in [our] independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly" is irrelevant, as AEDPA sets the bar higher. *Williams*, 529 U.S. at 411.

Finally, "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Lambert v. Blackwell*, 387 F.3d 210, 234-35 (3d Cir. 2004). In conducting this inquiry, we may not deem state-court factual determinations unreasonable "merely because [we] would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). Instead, § 2254(d)(2) demands we accord the state trial court substantial deference. So if "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Wood*, 558 U.S. at 301 (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)). Yet "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review," and "does not by definition preclude relief." *Miller-El*, 537 U.S. at 340.

Here, as previously described, the District Court declined to apply AEDPA deference in reviewing the Pennsylvania Supreme Court's decision to reject Randolph's Sixth Amendment choice-of-counsel claim, concluding "that the state court's application of federal law was objectively unreasonable." *Randolph v. Wetzel*, No. 1:06-cv-901, 2020 WL 2745722, at *9 (M.D. Pa. May 27, 2020). The District Court therefore reviewed Randolph's claim *de novo*. It found that the state trial court violated Randolph's Sixth Amendment rights, and that the Pennsylvania Supreme Court's rejection of Randolph's Sixth Amendment claim on direct appeal "was so lacking in justification that there was an error well understood

15

and comprehended in existing law beyond any possibility of fairminded disagreement." *Id.* at \*7 (quoting *Richter*, 562 U.S. at 103). For the following reasons, we agree with the District Court and will affirm its order and opinion.

## B. Sixth Amendment Claim

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Although the Sixth Amendment secures the right to the assistance of counsel, by appointment if necessary, in a trial for any serious crime, *Gideon v. Wainwright*, 372 U.S. 335, 342-43 (1963), the Supreme Court has long recognized that the Sixth Amendment also ensures the right of a defendant to retain his preferred counsel, *see Powell v. Alabama*, 287 U.S. 45, 53 (1932) ("It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice.").

To be sure, the right to one's counsel of choice "is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988). A defendant may not, for example, demand to be represented by an attorney who is not a member of the bar of the relevant jurisdiction or court, or by one that would create a serious risk of conflict of interest. *Id.* Nor can a defendant "insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant." *Id.* And the right to counsel of one's choice does not even extend to defendants who require counsel to be appointed for them. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006); *see also Wheat*, 486 U.S. at 159. The question raised in this case is the extent to which a criminal defendant's right under the Sixth Amendment to his chosen attorney is qualified by the state's legitimate interest in the efficient and effective dispensation of criminal justice.

In previous cases, the Supreme Court has explained how to weigh that state interest against a defendant's Sixth Amendment right to choice of counsel. For instance, the

16

Court has recognized that a trial court must have "wide latitude in balancing the right to counsel of choice against the needs of fairness." *Gonzalez-Lopez*, 548 U.S. at 152 (internal citation omitted); *see also Morris v. Slappy*, 461 U.S. 1, 11 (1983). The Court also has recognized that trial judges must have certain discretion over what we might call the exigencies of court administration. So on occasion a defendant's right to counsel of choice may be moderated by a trial court's schedule, or the court's need to "assembl[e] the witnesses, lawyers, and jurors at the same place at the same time." *Morris*, 461 U.S. at 11. But the Sixth Amendment entails a "presumption in favor of counsel of choice," *Wheat*, 486 U.S. at 160, and a trial court's "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel," *Morris*, 461 U.S. at 11-12 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

On direct appeal, the Pennsylvania Supreme Court held that the trial court did not violate Randolph's right to the counsel of his choice. *Randolph*, 873 A.2d at 1281-82. In doing so, it discussed only Pennsylvania law. In and of itself, so long as "neither the reasoning nor the result" contradicts clearly established federal law, that would not be a problem. *Early v. Packer*, 537 U.S. 3, 8 (2002).

Here, the legal standard articulated by the state supreme court does not contradict clearly established federal law. To the contrary, the court's discussion makes clear Pennsylvania law is consonant with federal law. The Pennsylvania Supreme Court, tracking *Wheat* and *Morris*, noted that the right to counsel of choice is not absolute. *Randolph*, 873 A.2d at 1282; *see also Wheat*, 486 U.S. at 159; *Morris*, 461 U.S. at 11. Further, the Pennsylvania Supreme Court reasonably observed that "the right of the accused to choose his own counsel . . . must be weighed against and may be reasonably restricted by the state's interest in the swift and efficient administration of criminal justice." *Randolph*, 873 A.2d at 1282 (quoting *Commonwealth v. Robinson*, 364 A.2d 665, 674 (Pa. 1976)).

However, whether the Pennsylvania Supreme Court articulated the appropriate law is only part of the equation. Under AEDPA, we must next ask if the state court's application of that law was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). And in this case, the Pennsylvania Supreme Court's decision involved an unreasonable application of clearly established Sixth Amendment law.

The Pennsylvania Supreme Court's analysis of Randolph's choice-of-counsel claim runs just six sentences, which, as above, we reproduce in full:

> This case had already been continued twice at the request of court-appointed counsel. [Randolph] waited until May 1, 2003, two business days before trial was scheduled to commence, to apprise the trial court of his desire to have private counsel represent him, even though he had first contacted private counsel about representation in January, 2003. The trial court denied [Randolph's] request for a continuance but gave [Stretton] the opportunity to participate and was willing to accommodate his schedule and allow him time to prepare following jury selection. However, [Stretton] never showed up at trial or during sentencing. In considering the motion for continuance, the trial court weighed [Randolph's] right to counsel of his choice against the state's interest in the efficient administration of justice. We find no abuse of discretion in the trial court's refusal to grant [Randolph's] request for a continuance.

*Randolph*, 873 A.2d at 1282. Plainly, the state supreme court's description of the state trial court's denial of Stretton's motion for a continuance mischaracterizes crucial details and omits others.

18

*First*, the case having "been continued twice" had nothing to do with Randolph or Stretton. *See id.* Welch moved to continue the trial in December 2002 because he struggled to receive discovery material from Randolph's prior counsel and grand jury material from the Commonwealth. Then, in February 2003, Welch moved to continue the trial again because his mother was ill and hospitalized. Up until the point he secured the funds to hire Stretton, Randolph more-or-less was the only party eager to proceed to trial. *See* App. 616 (January pretrial hearing) (Randolph asking "[w]hat's wrong with February" when Welch sought to delay the trial from January until March); App. 622 (April pretrial hearing) (Randolph noting that he "do[es] want [the start of trial] to be [as] prompt as possible."); App. 626 (May 1 pretrial telephone call) (Stretton noting that "[Randolph] said he only wanted a short continuance").

*Second*, Randolph did not "wait[] until May 1, 2003, . . . to apprise the trial court of his desire to have private counsel represent him." *See Randolph*, 873 A.2d at 1282. At the January 3, 2003, pretrial conference, for example, Randolph not only expressed to the trial court his dissatisfaction with Welch, *see* App. 614-17 ("Mr. Welch just doesn't have my best interest."), he also asked the court whether he could "hir[e] a second chair counsel." App. 617. The court declined, but the prosecutor made clear to Randolph that he *could* retain private counsel if he "could afford to come to an arrangement" with that counsel. *Id.* At that point, Randolph reminded the court that he could not hire private counsel because he was indigent. *Id.* Thus, no later than January 2003, Randolph made clear to the court that he wanted to replace his court-appointed counsel with another counsel (whether court-appointed or private), and that the only thing holding him back from hiring private counsel was money. To the extent the Commonwealth argues that Randolph should have informed the trial court earlier that he planned to retain Stretton, there was nothing to report to the trial court because Randolph did not secure the funds to hire Stretton until the week before trial. Indeed, the day after Randolph informed Stretton

19

that he could pay his retainer, Stretton attempted to enter his appearance and moved to continue the trial.

*Third*, the trial court did not give Stretton "the opportunity to participate" in Randolph's trial, nor was it "willing to accommodate his schedule." *See Randolph*, 873 A.2d at 1282. The day Stretton entered his appearance, he requested a one-month continuance. When the trial court refused, Stretton counteroffered with a request to delay trial by just a few days. When the trial court refused again, Stretton then requested a delay of just three hours. The trial court refused to grant even that modest accommodation. The court's obstinance is all the more striking considering that pretrial discussions that day took until 11:10 a.m.—just fifty minutes before the time Stretton had requested. The Pennsylvania Supreme Court's decision does not acknowledge this sequence or even mention the length of the continuance that Stretton ultimately sought.

*Fourth*, the trial court's willingness to "allow [Stretton] time to prepare following jury selection" could not have cured a Sixth Amendment violation. *See id.* Jury selection is a critical stage of a defendant's criminal proceeding. *See Lewis v. United States*, 146 U.S. 370, 374 (1892) ("[W]here the indictment is for a felony, the trial commences at least from the time when the work of impanelling the jury begins." (quotation omitted)); *see also Swain v. Alabama*, 380 U.S. 202, 219 (1965) (noting that because voir dire allows for peremptory challenges, it is "a necessary part of trial by jury"), *overruled on other grounds by Batson v. Kentucky*, 476 U.S. 79, 100 n.25 (1986). Further, jury selection is the primary means by which a defendant's counsel (and the trial court) may enforce the defendant's right to be tried by a jury free from ethnic, racial, or political prejudice, or predisposition about the defendant's culpability. *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2238-43 (2019). Finally, jury selection in a death penalty case is particularly important. To select a death-qualified jury, a defendant's counsel must ascertain additional information not relevant in a typical criminal case, like whether a potential juror would automatically impose the death penalty upon a qualifying conviction. *See Morgan v. Illinois*, 504 U.S. 719,

20

731-32 (1992); *see also Witherspoon v. Illinois*, 391 U.S. 510, 519-23 (1968).

*Fifth*, the state supreme court failed to mention that the attorney-client relationship between Randolph and Welch had eroded well before Stretton entered his appearance. Randolph raised his dissatisfaction with Welch at each pretrial conference available in the record, including the one on the morning of jury selection. By trial, the breakdown had become so severe that Thomas had to act as an intermediary between Randolph and Welch. The trial court was not unconcerned by Randolph's protestations, but it refused to entertain Randolph's requests for substitute appointed counsel, and never provided Randolph a full opportunity to present the reasons underlying the breakdown. *See Martel v. Clair*, 565 U.S. 648, 664 (2012); *see also McMahon v. Fulcomer*, 821 F.2d 934, 942 (3d Cir. 1987) (concluding that "when a defendant requests substitution of counsel on the eve of trial," the trial court "must engage in at least some inquiry as to the reasons for the defendant's dissatisfaction with his existing attorney" (quoting *United States v. Welty*, 674 F.2d 185, 187 (3d Cir. 1982))).

As the District Court concluded, "[o]nce the full panoply of relevant facts is articulated, the Sixth Amendment counsel-of-choice balancing becomes elementary." *Randolph*, 2020 WL 2745722, at *10. We agree. The decision by the state trial court to deny Stretton's motion for a continuance prevented Randolph from being represented by Stretton, his choice of counsel. Because the state trial court offered no justification for denying the continuance motion in this case, its decision violated Randolph's Sixth Amendment right to counsel of choice.

The Sixth Amendment counsel-of-choice balancing test weighs the defendant's right to counsel of choice against sufficiently countervailing reasons, like considerations of judicial administration. Neither the state supreme court in its decision nor the Commonwealth on appeal offers one such reason. The state supreme court concluded that Randolph "wait-

21

ed" until the eve of trial "to apprise the trial court of his desire to have private counsel represent him." *See Randolph*, 873 A.2d at 1282. We already have discussed why this mischaracterizes the record. If the state supreme court meant to imply that Randolph dallied to gain a strategic advantage, as the Commonwealth suggests on appeal, *see* Appellant Br. 15 (arguing that "Randolph was playing games with scheduling"), we disagree. Throughout the pretrial months, Randolph was eager to get to trial and resisted each delay. Randolph announced his hiring of Stretton as soon as he had the money to hire him, and Stretton's final request for a delay was modest—he sought to postpone the beginning of jury selection by only *three hours*.

The Pennsylvania Supreme Court also concluded that it gave Stretton the "opportunity to participate" in the trial, *Randolph*, 873 A.2d at 1282, suggesting that the trial court did not violate Randolph's Sixth Amendment rights at all. That is not so. It is true that the Sixth Amendment affords a criminal defendant only the "fair opportunity to secure counsel of his own choice." *Powell*, 287 U.S. at 53. Here, however, the state trial court's ruling prevented Stretton from picking Randolph's jury, a critical stage of the criminal proceeding, and the court was unwilling to be even minimally accommodating to Stretton's reasonable request for a minor delay.

The Commonwealth's remaining arguments are not persuasive. Given the short delay Stretton requested, the Commonwealth cannot seriously claim that "Stretton would have had to build Randolph's defense from the ground up which would require an unreasonable delay." Appellant Br. at 14-15. And, for two reasons, it fares no better in contending that the source of funds that were to pay for Stretton evaporated following Stretton's entry of appearance. Appellant Br. at 19.

For one, the District Court concluded otherwise, *see Randolph*, 2020 WL 2745722, at *9-10 ("We set forth the following additional facts indispensable to evaluating the constitutional claim at issue[:] . . . . [T]he funds to hire [Stretton] did

not become available until April 29."), and we must accept that finding unless it is clearly erroneous. On this record, it is not. So even if the Randolphs did not sell the family business, Thomas testified that the family still was able to sell an asset related to that business to raise the funds to pay for Stretton. App. 596.

For another, whether Randolph secured the funding *to eventually pay* Stretton is largely irrelevant. By May 1, 2003, Stretton had agreed to represent Randolph and had entered his appearance to do just that. Even if he wanted to withdraw representation, he would have needed the leave of the trial court. Pa. R. Crim. P. 120(C) (Dec. 2002); *see also Commonwealth v. Magee*, 177 A.3d 315, 325-26 (Pa. Super. Ct. 2017); *Commonwealth v. Ford*, 715 A.2d 1141, 1145-46 (Pa. Super. Ct. 1998). More practically, a subsequent development concerning a sale of a business or business asset could not have influenced the trial court's decision to deny Stretton's motion for a continuance.

For these reasons, we are satisfied that the decision of the Pennsylvania Supreme Court involved an unreasonable application of clearly established Sixth Amendment law. Said another way, we are satisfied that no fairminded jurist could disagree that the Pennsylvania Supreme Court's decision conflicts with the Supreme Court's Sixth Amendment jurisprudence. We acknowledge that those precedents grant trial courts "wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152 (internal citation omitted). But neither of those limitations on the right to choice of counsel is relevant here. Granting Stretton's three-hour continuance would not have been unfair to the prosecution, nor would it have strained the state's interest in the "swift and efficient administration of criminal justice" or permitted Randolph "to unreasonably clog the machinery of justice or hamper and delay the state's efforts to effectively administer justice." *Randolph*, 873 A.2d at 1282 (citations and quotation marks omitted). It was just three hours.

23

We also acknowledge that the standards imbedded in AEDPA are designed to be "difficult to meet." *Richter*, 562 U.S. at 102. The grant of a writ of habeas corpus is strong medicine, and it implicates concerns of federalism, comity, and finality. But if the Sixth Amendment's guarantee to one's counsel of choice is to mean anything, it must mean that a criminal defendant may select and retain the counsel of his choice, and the trial court must make every reasonable accommodation to facilitate that representation, provided that the selection and retention of that counsel will not substantially prejudice the prosecution or significantly impair the trial court's ability to dispense criminal justice.[3]

---

[3] The Commonwealth makes two additional arguments. Neither is persuasive. *First*, it argues that the District Court's habeas analysis erroneously relied on *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), a case not decided until after the Pennsylvania Supreme Court affirmed Randolph's convictions on direct appeal. Appellant Br. 24-27. Not so. In its opinion, the District Court discussed *Gonzalez-Lopez* but made clear that the case "was decided in 2006 and thus does not inform the 'clearly established' federal law existing at the time of Randolph's trial." *Randolph*, 2020 WL 2745722, at *9 n.7. Instead, the District Court "rel[ied] on *Gonzalez-Lopez* merely for its affirmation of prior, clearly held Supreme Court jurisprudence." *Id.* That is correct. The right to counsel of one's choice has been firmly embedded in our constitutional structure for nearly a century, *see, e.g.*, *Powell*, 287 U.S. at 53, and the District Court's citations to more recent decisions served only to call attention to the continued vitality of that principle. *Second*, the Commonwealth argues that Randolph waived (or forfeited) any Sixth Amendment right he is now claiming. Appellant Br. 27-34. Once again, we disagree. Any Sixth Amendment waiver must be knowing, voluntary, and intelligent, or preceded by conduct that clearly implies that the defendant wishes to waive a particular component of the right. Moreover, to effect a Sixth Amendment waiver, a trial court must ensure—typically through a colloquy with the defendant—that the decision by the defendant "is intelligently and competently made." *Welty*, 674 F.2d at 187. Neither of those prerequisites were met here.

## III.    CONCLUSION

Few would dispute that "the most important decision a defendant makes in shaping his defense is his selection of an attorney." *United States v. Laura*, 607 F.2d 52, 56 (3d Cir. 1979). For those able to secure representation in a criminal case independent of a court appointment, a fair opportunity to select and retain one's choice of counsel is not just a boon, it is a right protected by the Sixth Amendment. *Powell*, 287 U.S. at 53. One's right to choice of counsel is not without limits. Trial courts retain certain discretion to balance that right with the exigencies of administering criminal justice. But however broad a court's discretion may be, it is not broad enough to excuse the Sixth Amendment violation that occurred here. We hold that the state trial court's error violated Randolph's Sixth Amendment right to counsel of choice, that the Pennsylvania Supreme Court's decision holding otherwise was unreasonable under AEDPA, and that this violation is not subject to harmless-error analysis. *Gonzalez-Lopez*, 548 U.S. at 152. Further, because the Pennsylvania Supreme Court's decision was unreasonable in its application of federal law, we need not reach whether its decision was based on an unreasonable determination of the facts.

The judgment of the District Court therefore will be affirmed, and the case will be remanded for the District Court to issue a writ of habeas corpus.