NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-2372
_____

DAVID SATTAZAHN,
                                        Appellant

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF CORRECTIONS;
SUPERINTENDENT GREENE SCI; THE DISTRICT ATTORNEY OF BERKS
COUNTY; THE ATTORNEY GENERAL OF THE COMMONWEALTH OF
PENNSYLVANIA
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 5-17-cv-03240)
District Judge: Honorable John R. Padova
_____

ARGUED: February 24, 2023

Before: CHAGARES, *Chief Judge,* SCIRICA, and SMITH, *Circuit Judges.*

(Filed: May 26, 2023)

Samuel J.B. Angell [ARGUED]
David L. Zuckerman
Federal Community Defender Office for the
Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA  19106

        *Counsel for Appellant*

Hugh J. Burns, Jr. [ARGUED]
Office of Attorney General of Pennsylvania
1600 Arch Street
Suite 300
Philadelphia, PA 19103

      *Counsel for Appellees*

————————————

OPINION[*]

————————————

**SCIRICA**, *Circuit Judge*

David Sattazahn was convicted of first degree murder and related offenses for a robbery that resulted in the death of Richard Boyer, a restaurant manager. Sattazahn's co-conspirator, Jeffrey Hammer, pleaded guilty to third degree murder. In his state habeas proceedings and before the District Court, Sattazahn argued the Government withheld material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and failed to correct a witness' testimony in violation of *Brady*, *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972).[1] The District Court held the Government

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] Under *Brady*, *Napue*, and *Giglio*, the suppression of material evidence favorable to the defendant violates due process. In *Brady,* the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In *Napue*, the Supreme Court held that the "principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness." 360 U.S. at 269. In *Giglio*, the Supreme Court held that "whether the

2

failed to disclose evidence that Hammer disagreed with a witness' account of a conversation between Hammer and Sattazahn but found that this evidence was not material. The District Court further held that the Government had no duty to correct the witness' testimony because there was no evidence of an undisclosed agreement between the Government and the witness. We agree with the District Court that Sattazahn has not made a sufficient showing of a *Brady* or *Napue/Giglio* violation. We will affirm.

## I.

The story of this case has three important characters: David Sattazahn, the petitioner, who was convicted of first degree murder for the death of Richard Boyer; Jeffrey Hammer, his co-conspirator, who testified against Sattazahn in exchange for pleading guilty to third degree murder; and Fritz Wanner, a family friend of Hammer's, whose testimony about a conversation he overheard between Sattazahn and Hammer is the focus of Sattazahn's habeas claims.

## A.

In 1987, Sattazahn and Hammer spent weeks preparing to rob a local restaurant. From their hiding spot in a copse of pine trees, the two observed that the manager, Richard Boyer, left the restaurant with a bank deposit bag every night. The plan was to get Boyer to hand over the cash and then handcuff him in his truck to give them time to flee the scene.

Sattazahn and Hammer decided to put their plan into action on April 12, a Sunday, after learning that the restaurant was busiest on Sundays. Equipped with ski masks, gloves,

---

nondisclosure [of evidence] was the result of negligence or design, it is the responsibility of the prosecutor" to correct testimony known to be false. 405 U.S. at 154.

.22 and .41 caliber handguns with the serial numbers filed off, extra ammunition, flashlights, and handcuffs, the two rode an all-terrain vehicle across railroad tracks to the pine trees behind the restaurant. There they lay in wait for Boyer to leave with the day's cash deposit.

When Boyer left the restaurant and started walking towards his truck, Sattazahn and Hammer emerged from the trees, their guns drawn. Sattazahn moved towards the truck and told Boyer to drop the deposit bag. Boyer instead threw the bag behind him. Sattazahn told Boyer to bring him the bag, but Boyer threw it towards the restaurant's roof and ran. Sattazahn fired the .22 at Boyer. Thinking this was a warning shot, Hammer fired the .41 into the air. Sattazahn then fired two or three more shots at Boyer, who fell.

With Boyer sprawled on the ground but still moving, Sattazahn ran over to Boyer, grabbed the deposit bag that was just out of Boyer's reach, and then fled with Hammer on the all-terrain vehicle back across the railroad tracks.

Boyer's body was discovered with five gunshot wounds in his face, head, shoulder, and back. Two .22 bullets were recovered during his autopsy and five .22 casings were found at the scene. A week after the robbery, Sattazahn and Hammer realized that their duffle bag—which contained their guns and other equipment—was missing. They tried to find it but came up empty handed.

In the summer of 1989, Hammer told the police about the robbery, implicating himself and Sattazahn, and admitted they lost their duffel bag somewhere near the railroad tracks. The bag was subsequently found and turned over to the police. Hammer pled guilty to third degree murder and associated offenses in exchange for testifying against Sattazahn.

In the fall of 1989, Fritz Wanner was in custody for an unrelated burglary when police asked what he knew about the 1987 robbery. Wanner told the police that, a few days after the robbery, he was in a barn that belonged to Hammer's father-in-law when he overheard Sattazahn and Hammer arguing about dropping a bag. According to Wanner, Sattazahn said he grabbed the .22 from Hammer and shot Boyer because Hammer missed. Wanner initially told the police he was with someone called Simmons at the time. Later, Wanner said that he was actually in the barn with a man called Joe Russo, not Simmons, but had been afraid to name Russo out of fear he was in the mafia.

B.

Sattazahn was tried twice for capital murder—first in 1991 and again in 1999 after his conviction was vacated. At Sattazahn's first trial, Hammer testified that Sattazahn shot Boyer with the .22. The Government established that Sattazahn purchased the .22 but had no other witnesses who testified about the identity of the shooter. Wanner refused to testify out of fear for his safety. The jury found Sattazahn guilty of first degree murder. The appeals court held that the trial court gave an erroneous jury instruction and vacated the conviction. *See Commonwealth v. Sattazahn*, 631 A.2d 597, 606 (Pa. Super. Ct. 1993). The appeals court also found, however, that there was sufficient evidence on the record to convict Sattazahn of first degree murder. *Id.* at 602.

At Sattazahn's retrial, the Government called both Hammer and Wanner as witnesses. Hammer's testimony was much the same as it was during Sattazahn's first trial. Sattazahn brought out Hammer's deal with the Government on cross examination and argued Hammer had planned and carried out the robbery on his own. Wanner testified that

5

he saw Sattazahn and Hammer at the barn and heard them argue about a missing bag. According to Wanner, Sattazahn threatened to kill Hammer and his family if they were caught and complained that he had to grab the gun and shoot Boyer because Hammer missed. Wanner admitted that he had memory problems stemming from drug use and that he had changed his story about who was with him at the time he overheard the conversation. He denied that he was promised anything or expected anything in exchange for his testimony. Sattazahn briefly mentioned Wanner during closing arguments, though not by name. The jury convicted Sattazahn of first degree murder. Sattazahn was then sentenced to death.

## C.

Sattazahn sought state post-conviction relief for, *inter alia*, errors during the penalty phase of his retrial as well as *Brady* and *Napue/Giglio* violations. During Sattazahn's evidentiary hearing, Wanner testified—contrary to his trial testimony—that he did not actually see Sattazahn and Hammer and was not sure who was with him when he overheard the conversation. Wanner also testified that he spoke with the prosecutor before Sattazahn's trial, and the prosecutor said that he would not make a deal but would "see what he could do" in Wanner's upcoming case. JA 307 at 87:11–12.

The trial prosecutor[2] testified about his conversation with Wanner as well as about

---

[2] The trial prosecutor was Mark Baldwin, who was serving as the District Attorney for Berks County at the time of Sattazahn's Post-Conviction Relief Act hearing. In 2020, the Court of Common Pleas for Berks County dismissed homicide charges in an unrelated case after finding that Baldwin intentionally suppressed police reports the defense could have used to impeach the Government's key witness. *See Commonwealth v. Roderick Johnson*, No. 0118-97; 1537-97 (Berks Cty., Oct. 29, 2020). Sattazahn urges us to review his *Brady*

6

handwritten notes he took on a conversation he had with Hammer in 1990 about Wanner's 1989 statement. The prosecutor recorded that Hammer

> [r]emembers a conversation but <u>not</u> sure when or if Joe from Pizza Shop was there . . . [a]bout a week after shooting discussion in Barn possible that Fritz Wanner was in Barn in another section . . . only ever saw Joe in Pizza shop <u>not</u> in Barn[.]
> JA 1029.

The prosecutor maintained that the notes were available to Sattazahn's trial counsel, even though they were not turned over during discovery and arguably qualified as work product, because of his office's open file policy. The existence of this policy is not corroborated elsewhere in the record.

Hammer testified that he told the prosecutor that some parts of Wanner's statement were inaccurate: Joe was not at the barn during the conversation and Sattazahn never said he grabbed the .22 from Hammer and shot Boyer. Hammer also testified that he had not

---

claim de novo and consider this *Johnson* case as support for his claim. We will review the *Brady* claim de novo, for reasons discussed below. We will not, however, consider *Johnson* in our review.

Assuming arguendo that *Cullen v. Pinholster*, 563 U.S. 170 (2011), is inapplicable and we may consider evidence that was not before the State court, Sattazahn does not explain how Baldwin's misconduct in a separate case—though undoubtedly egregious—supports his *Brady* claim. As *Johnson* is not factually analogous, it cannot help Sattazahn establish a pattern of *Brady* violations making it more likely that Baldwin suppressed evidence in his case. Although "[t]he gravity of the prosecutor's misconduct . . . may shed light on the materiality of the infringement of the defendant['s] rights," there is insufficient support in the record here—unlike in *Johnson*—to infer that Baldwin "resorted to improper tactics because [he was] justifiably fearful that without such tactics the defendant[] might be acquitted." *See United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995); *see also Johnson*, No. 0118-97 at 14–17, 30 (describing how the suppressed police reports would have allowed the defense to show that the Government's key witness, who did not have a record, was a career drug dealer who routinely made deals with the police to avoid charges).

seen Wanner in the barn, which he described as a garage with three sections and a top floor.

The post-conviction court granted Sattazahn a new penalty hearing[3] but denied his *Brady* and *Napue/Giglio* claims. The court found the prosecutor's notes about his conversation with Hammer were not impeachment evidence because the notes may not have accurately reflected Hammer's statements. *Commonwealth v. Sattazahn*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 104, *45–46 ("[I]t is unfair to allow the defense to use statements to impeach a witness which cannot fairly be said to be the witness' own rather than the product of the investigator's selection, interpretation, and recollection."). Even if the notes were impeachment evidence, the court reasoned, the impact on Wanner's credibility would not have been material. *Id.* at *47–48.

As for Sattazahn's *Giglio* claim, the court found the prosecutor's statement to Wanner that he would "see what he could do" about his upcoming case was not evidence of an undisclosed agreement. *Id.* at *40–41. Even if it were, Wanner was of secondary importance to Hammer and was already impeached on multiple grounds, so evidence of an agreement would be unlikely to change the outcome of the trial. *Id.* at *42.

The Pennsylvania Supreme Court affirmed. *Commonwealth v. Sattazahn*, 952 A.2d 640 (Pa. 2008). The Pennsylvania Supreme Court adopted the post-conviction court's analysis of the alleged tacit agreement between the prosecutor and Wanner in its entirety. *Id.* at 651, 659. In a departure from the post-conviction court, however, the Supreme Court

---

[3] Sattazahn's penalty phase claims, which are not at issue here, have their own long history. *See Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003) (holding that the imposition of the death sentence on retrial does not violate double jeopardy). Sattazahn was eventually resentenced to life imprisonment.

noted there was a "colorable argument" that the prosecutor's notes were impeachment evidence under *Brady*. *Id.* at 658. The Court did not discuss whether the notes accurately reflected Hammer's statements. Instead, the Court asserted that "[n]o *Brady* violation occurs where the defendant knew or could have uncovered the relevant evidence with reasonable diligence." *Id.* (citing Pennsylvania Supreme Court cases). Sattazahn was a participant in the conversation that Wanner overheard and, the Court reasoned, could have told his trial counsel that Wanner's testimony was inaccurate. *Id.* Sattazahn's trial counsel could then have cross-examined Wanner or Hammer on the inaccuracy. *Id.* The Court concluded that Sattazahn "failed to establish a lack of relevant knowledge on his part and/or an inability to obtain such knowledge upon reasonable diligence." *Id.*

D.

As noted, Sattazahn brought a federal habeas petition repeating, *inter alia*, his claims that the prosecutor's undisclosed conversation with Hammer and alleged tacit agreement with Wanner violated *Brady* and the alleged tacit agreement further violated *Napue/Giglio*. Amended Petition for Writ of Habeas Corpus at 19, *Sattazahn v. Wetzel*, No. 17-cv-3240, Doc. No. 15. In a detailed opinion, the District Court adopted the recommendation of the Magistrate Judge that Sattazahn had insufficient evidence to support his claims. *Sattazahn v. Wetzel*, No. 17-cv-3240, 2021 WL 2291334 (E.D. Pa. June 3, 2021). On a motion for reconsideration, the District Court granted a certificate of appealability for Sattazahn's *Brady* and *Napue/Giglio* claims. We will affirm the District Court's denial of Sattazahn's petition.

II.

9

We exercise plenary review over a district court's habeas determinations. *Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009). When a habeas petitioner raises federal constitutional claims that a State court denied on the merits, we examine whether the court's ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Clearly established federal law" comprises U.S. Supreme Court decisions issued before the State court decided the petitioner's claim on the merits. *Greene v. Fisher*, 565 U.S. 34, 40 (2011).

A State court decision is "contrary to" clearly established federal law if it contradicts Supreme Court precedent or involves facts "that are materially indistinguishable" from those in a Supreme Court decision but reaches a different result. *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)); *see also Randolph v. Sec'y Pa. Dep't of Corr.*, 5 F.4th 362, 372 (3d Cir. 2021). An application of clearly established federal law is unreasonable if there is no possibility "fairminded jurists could disagree that those arguments or theories are inconsistent with [a prior Supreme Court holding]." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). A determination of the facts is unreasonable if all "[r]easonable minds reviewing the record" would reach a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010) (alteration in original); *see also Randolph*, 5 F.4th at 373 (noting that the State court's factual determination is reviewed for objective unreasonableness).

If we conclude that a State court's merits decision on a particular claim was contrary

10

to clearly established federal law or unreasonable, we review that claim de novo. *Vickers v. Superintendent Graterford SCI*, 858 F.3d 841, 849 (3d Cir. 2017) (citing *Lafler v. Cooper*, 566 U.S. 156, 174 (2012)).

## III.

Evidence the Government fails to disclose qualifies as a violation of *Brady v. Maryland* if it (1) is exculpatory or impeaching; (2) was suppressed by the State; and (3) is prejudicial to the defendant, *i.e.*, material. *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011); *see also Strickler v. Greene*, 527 U.S. 263, 281–82 (1999) (remarking that a *Brady* violation requires that material evidence is "suppressed by the state," but the suppression need not be willful). "Evidence is material 'if there is a "reasonable probability" that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *see Banks v. Dretke*, 540 U.S. 668, 698 (2004) (emphasizing that "the materiality standard for *Brady* claims is met" when the favorable evidence is sufficient to "'undermine confidence in the verdict'" (quoting *Kyles*, 514 U.S. at 435)).

Sattazahn argues the prosecutor violated *Brady* by failing to disclose (1) the fact that he had a conversation with Hammer before the 1991 trial and notes from that conversation and (2) the alleged tacit agreement he had with Wanner.

The District Court, accepting the Magistrate Judge's recommendation, reviewed Sattazahn's first claim de novo. The District Court read the Pennsylvania Supreme Court's description of the *Brady* standard as "improperly impos[ing] a diligence requirement on Sattazahn." JA13; *Sattazahn*, 952 A.2d at 658 (finding Sattazahn failed to show reasonable

11

diligence); *see Dennis v. Sec'y. Pa. Dep'. Corr.*, 834 F.3d 263, 293 (3d Cir. 2016) ("Adding due diligence . . . to the well-established three-pronged *Brady* inquiry would similarly be an unreasonable application of, and contrary to, *Brady* and its progeny.").

We agree that de novo review is proper. As noted, the Pennsylvania Supreme Court ended its analysis of the Hammer conversation by concluding that Sattazahn "has failed to establish a lack of relevant knowledge on his part and/or an inability to obtain such knowledge upon reasonable diligence." *Sattazahn*, 952 A.2d at 658. This reasoning is contrary to *Brady*, which is clearly established federal law. *See Dennis*, 834 F.3d at 293.

Sattazahn knew he had an argument with Hammer about the robbery. But he could not have known that the prosecutor spoke with Hammer about Wanner's statement, or that Hammer contradicted Wanner about Sattazahn's confession during that conversation. The impeachment evidence Sattazahn identified is not simply the prosecutor's notes or that Wanner erroneously said Sattazahn confessed to shooting Boyer—it is also that Sattazahn's own co-conspirator pointed out that Sattazahn did not confess.

As discussed below, the value of this impeachment evidence to Sattazahn's defense is questionable. But the Pennsylvania Supreme Court's error goes to the second prong of the *Brady* analysis, suppression by the State, not the third prong, materiality. Sattazahn did not know about the notes or Hammer's response to Wanner's statement. Under *Brady*, it does not matter whether Sattazahn could have discovered either with reasonable diligence.

Although we conclude that the Pennsylvania Supreme Court's analysis is contrary to *Brady*, we reach the same ultimate conclusion. The notes and conversation are *Brady* evidence—that is, impeaching and suppressed by the State—but are not material.

12

Sattazahn's strategy at both trials was to frame Hammer as incredible and ready to sacrifice Sattazahn, quite literally, to avoid a capital sentence. As the District Court noted, introducing even a portion of the notes and conversation would require Sattazahn to present Hammer as incredible *except* for his recollection of the argument in the barn. Sattazahn would likely have to explain to the jury why Hammer, a man willing to send his innocent friend to death row to secure a plea deal, told the prosecutor that said friend never confessed to shooting Boyer.

Even putting the issue of Hammer's (in)credibility to one side, it is difficult to see how the suppressed evidence could be material when it would, in large part, corroborate rather than undermine Wanner's testimony. Most of the discrepancies between the two accounts of the argument are explained by the barn's character. The uncontroverted evidence in the record is that the barn was large and had multiple areas. It is possible that Wanner, either alone or with someone else, could have overheard the argument without Sattazahn or Hammer noticing.

The major point of disagreement—whether Sattazahn confessed to grabbing the .22 from Hammer and shooting Boyer—is of minor importance when considered in context. The notes and conversation undermine Sattazahn's theory that Hammer acted alone. If Sattazahn had cross-examined Hammer on the suppressed evidence, the jury would likely have heard him agree with Wanner that he fought with Sattazahn over the missing bag and that Sattazahn threatened to kill his family if they were caught. This would have helped rehabilitate Wanner, who admitted that his memory was generally poor and that he changed portions of his statement. It would also have made the absence of testimony from Joe Russo

13

less conspicuous.

Because the prosecutor's notes and Hammer's statements would likely have a similar impact on Sattazahn's defense as Wanner's uncontradicted testimony that he overheard Sattazahn confess, we find that they are not material. Accordingly, we conclude that there was no *Brady* violation.

IV.

We review Sattazahn's second *Brady* claim, regarding the prosecutor's failure to disclose a tacit agreement with Wanner, under the deferential § 2254(d) standard. This *Brady* claim dovetails with Sattazahn's *Napue/Giglio* claim that the prosecutor failed to correct Wanner's testimony that he had not been promised anything and did not expect anything in exchange for his testimony. The post-conviction court held that Sattazahn did not demonstrate the existence of a tacit agreement and, even if he did, there was not a reasonable likelihood that Wanner's false testimony affected the jury's judgment. Like the District Court, we discern no error in the State post-conviction court's merits determination.

Under *Brady*, impeachment evidence includes tacit agreements made with a witness "so long as the prosecution offers the witness a benefit in exchange for his cooperation." *Akrawi v. Booker*, 572 F.3d 252, 262 (6th Cir. 2009); *see also United States v. Bagley*, 473 U.S. 667, 683 (1985) (noting that informal deals can qualify as *Brady* evidence). An agreement may be tacit, but it must be a true agreement—both the witness and the prosecutor must understand that the witness will receive favorable treatment in exchange for their testimony. *Akrawi*, 572 F.3d at 263. The fact that a witness received favorable

14

treatment after the trial, without more, is not evidence of a pre-trial agreement. *Lesko v. Sec'y Pa. Dep't of Corr.*, 34 F.4th 211, 234 (3rd Cir. 2022) (citing *Shabazz v. Artuz*, 336 F.3d 154, 165 (2d Cir. 2003)).

Under *Giglio v. United States*, 405 U.S. 150, 154 (1972), prosecutors have a duty to correct a witness' testimony when they know it to be false. A falsehood is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Haskell v. Superintendent SCI Greene*, 866 F.3d 139, 149 (3d Cir. 2017). This is a more lenient materiality standard than *Brady*, which requires that suppressed evidence be sufficient to "undermine confidence in the verdict." *Banks*, 540 U.S. at 698.

The prosecutor told Wanner that he would not make a deal but would "see what he could do" in Wanner's upcoming case. Because this statement is ambiguous in context, Sattazahn cannot show that the post-conviction court should have found *Brady* and *Napue/Giglio* violations. *See Harrington*, 562 U.S. at 102 (describing an application of clearly established federal law as unreasonable if "fairminded jurists" would all agree that the application is inconsistent with Supreme Court precedent); *Wood*, 558 U.S. at 301 (describing a determination of the facts as unreasonable if all "[r]easonable minds reviewing the record" would disagree with the determination); *see also Davis v. Ayala*, 576 U.S. 257, 271 (2015) (clarifying that a State court's factual findings are presumed correct unless the petitioner rebuts the presumption with "clear and convincing evidence"). Sattazahn does not offer evidence demonstrating consensus on whether a phrase like "I'll see what I can do" is proof of a tacit agreement under clearly established federal law. We do not think such evidence exists. Our sister courts disagree on what constitutes proof of a

tacit agreement. *See Rega v. Wetzel*, No. 2:13-cv-1781, 2018 WL 897126, at \*77–83 (W.D. Pa. Feb. 18, 2018) (comparing cases from various circuits). We have not held that the Supreme Court's precedent constitutes clearly established federal law with respect to this question. *See id.* If "I'll see what I can do" is not proof of a tacit agreement, it is not *Brady* evidence, and accordingly Wanner's testimony did not require correction under *Napue/Giglio*.[4]

Even if the prosecutor's statement to Wanner did qualify as a tacit agreement, the prosecutor's failure to disclose and failure to correct were not material. Wanner was already impeached on multiple grounds, and the jury heard about his criminal convictions. The jury credited Hammer's testimony even though he admitted to a deal on cross-examination. Without evidence that Wanner and Hammer colluded, it is not likely that this additional line of impeachment would undermine confidence in the verdict. Whether information about a deal could have affected the jury's judgment—the more lenient *Giglio* standard—may be a closer call. But our review is deferential. Because fairminded jurists

---

[4] Sattazahn proposes that, in the context of a *Brady* or *Napue/Giglio* analysis, there is a meaningful difference between an "agreement" and an "inducement." He argues that because the post-conviction court's analysis—expressly approved by the Pennsylvania Supreme Court—only described the prosecutor's statement to Wanner as an "agreement," that analysis rested on an unreasonable factual determination. We are not convinced that the difference Sattazahn perceives is a meaningful one. For there to be an agreement requiring disclosure under *Brady*, there must be an inducement (*i.e.*, an incentive or promise of some benefit). A court may determine that no agreement existed while still finding evidence of an inducement requiring disclosure under *Brady*. Here, however, the main question facing the post-conviction court was whether the prosecutor's statement qualified as a promise or suggestion of leniency. In determining that no agreement existed, the post-conviction court had to conclude that there was no inducement. Accordingly, the court's analysis did not rest on an unreasonable factual determination.

16

(or reasonable minds) could disagree about the materiality of the agreement under *Giglio*, we find no grounds for disturbing the post-conviction court's conclusion.

V.

We will AFFIRM the District Court's denial of the habeas petition.